# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASON STEINHARDT, ROBERT ASUNCION, and JAMES QUANN on behalf of themselves and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>Volkswagen Group of America, Inc., Audi of America, LLC,<br><br>     Defendants. | Civil Action No. 23-2291 (MAS) (RLS)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jason Steinhardt, Robert Asuncion and James Quann ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendants Volkswagen Group of America, Inc. ("Volkswagen") and Audi of America, LLC ("Audi") (collectively, "Defendants").

## INTRODUCTION

1.     This is a class action brought against Defendants by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of 2018-2023 Audi A6, A7, A8, and Q7 vehicles; 2018 and 2020-2023 Audi S6, S7, S8, and R8 vehicles; 2018 and 2021-2023 Audi RS 7 vehicles; 2019-2023 Audi Q8 vehicles; 2020-2023 Audi A6 allroad, SQ7, SQ8, and RS Q8 vehicles; 2020-2021 Audi A8 e quattro vehicles; and 2021-2023 Audi A7 e quattro vehicles (collectively, the "Class Vehicles"). Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles.

2.     The Class Vehicles suffer from a serious alternator defect that causes the vehicle to shut down while in operation and/or fail to start. Specifically, due to the defective alternators, which are responsible for providing electricity to charge the battery and power electrical systems, the Class Vehicles experience electrical malfunction, causing dashboard warning lights to illuminate and the vehicle to

become inoperable (the "Alternator Defect" or "Defect"), often while the vehicle is in motion. The Defect renders the vehicles inoperable when it manifests and requires replacement of the alternator.

3.     The Defect often manifests while the car is being driven, creating a significant safety hazard. When this happens, the alternator warning light illuminates and various electrical systems malfunction, including the vehicle's power braking and power steering. The Defect can also cause Class Vehicles to stall while in operation. This presents a significant safety hazard.  Many owners and lessees have reported that their Class Vehicles stalled while in operation on busy streets, highways, and bridges.

4.     Additionally, even though most of the Class Vehicles are under warranty, Defendants have been unable to provide replacements within a reasonable time because the defect is so pervasive that there is a long backorder on replacement alternators, often leaving owners and lessees without use of their Class Vehicles for months. Since dealerships often do not have loaner vehicles available, many owners and lessees have to pay thousands of dollars out of pocket for rental cars or other alternative means of transportation.

5.     Because the Alternator Defect makes Class Vehicles unreliable and renders them inoperable when it manifests, it affects their central functionality.

6. Defendants are aware of the Alternator Defect but have failed to provide adequate repairs and have continually sold the Class Vehicles without disclosing this known defect to purchasers.

7. Defendants have been aware of the Defect for years, as evidenced by several manufacturer communications and technical service bulletins ("TSBs") and large numbers of owners and lessees who have complained about this Defect dating back to at least 2018, including when consumers brought their Class Vehicles to Defendants' authorized dealers for repairs.

8. Despite Defendants' knowledge of the Defect, which renders the Class Vehicles hazardous and unsuitable for their intended purpose, they have failed to provide adequate repairs and have also failed to disclose the Defect to unsuspecting purchasers and lessees.

9. Due to the undisclosed Alternator Defect, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Audi vehicles. These customers continue to have to live with the risks of their vehicles stalling in the middle of traffic, potential alternator failure, costly replacements, loss of use of their Class Vehicles, out of pocket expenses for rental cars, alternative transportation, towing services, and diminution of value of their vehicles. Plaintiffs accordingly seeks relief both for themselves and for other current and former owners or lessees of these Class Vehicles.

3

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district and are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

12.     This Court has personal jurisdiction over Defendants because they are incorporated in this District, have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## PARTIES
### Plaintiff Jason Steinhardt (Maryland)

13.    Plaintiff Jason Steinhardt is a citizen and resident of Maryland.

14.    On January 4, 2021, Mr. Steinhardt purchased a new 2021 Audi Q8 from Criswell Audi, which is an authorized Audi dealership located in Annapolis, Maryland.  Prior to his purchase, Mr. Steinhardt spoke with his dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at a brochure.  Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Alternator Defect had been disclosed.

15.    Mr. Steinhardt purchased his vehicle for personal, family, or household use. Mr. Steinhardt at all times has attempted to use his Class Vehicle in the normal and expected manner.

16.    On August 10, 2022, after just over 50,000 miles, Mr. Steinhardt received a notification on his vehicle's dashboard about a drive system malfunction. His vehicle began slowing down without control, forcing him to quickly pull his car to the side of the road before it completely shut off.

17.     His car was towed to the dealership.  The dealership replaced the 48-volt battery, a belt, and the water pump. The dealership charged Mr. Steinhardt $3,599.96 for the repair.

18.    Then, just a few months later on November 7, 2022, the same drive system malfunction occurred, again while Mr. Steinhardt was operating the vehicle.

The vehicle was towed to the dealership again, and the technician diagnosed the issue as a result of an alternator failure.

19.    As the alternator parts were on backorder, Mr. Steinhardt was left waiting for two months without his vehicle before the repair was finally completed in or around January 2023. He ended up paying $2,975.31 out-of-pocket for the repair and also paid $552 out-of-pocket for a rental vehicle for one week.

20.    Mr. Steinhardt fears his vehicle will experience another unexpected electrical system failure, something which could have disastrous consequences.

21.    Had Audi and Volkswagen disclosed the Alternator Defect, Mr. Steinhardt would not have purchased his Class Vehicle or would have paid significantly less for it.

22.    Additionally, as result of the Defect, Mr. Steinhardt has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. His vehicle has also suffered diminution in value due to the Defect.

23.    On November 15, 2022, through his counsel, Mr. Steinhardt served Audi and Volkswagen with a pre-suit letter notifying Audi and Volkswagen of claims on behalf of himself and other similarly situated consumers for breach of express and implied warranty and violation of consumer protection statutes, and demanding, *inter alia*, relief on behalf of himself and all putative class members.

**Plaintiff Robert Asuncion (California)**

24.    Plaintiff Robert Asuncion is a citizen and resident of California.

25.    On February 2, 2021, Mr. Asuncion purchased a new 2021 Audi Q8 from Stevens Creek Audi which is an authorized Audi dealership located in San Jose, CA. Prior to his purchase, Mr. Asuncion spoke with his dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at a brochure.  Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Alternator Defect had been disclosed.

26.    Mr. Asuncion purchased his vehicle for personal, family, or household use. At all times, Mr. Asuncion has attempted to use his Class Vehicle in the normal and expected manner.

27.    On March 10, 2023, after just over 30,577 miles, Mr. Asuncion's wife, when driving the car, received a notification on the vehicle's dashboard warning of an electrical system failure. She barely made it home as the car's electrical functions were imminently failing completely.

28.    Once his wife got home, Mr. Asuncion called his local dealership about the electrical system failure error message. He had difficulty even getting an appointment at his dealership.

29.    Eventually, his car was taken to the dealership for an inspection. The technician at the dealership confirmed the electrical system failure was the result of

an alternator failure. Due to a nationwide shortage, the replacement alternator part was not available and may not be available for several weeks or months. Mr. Asuncion was eventually issued a loaner vehicle that suffered from the very same issue.

30.    Had Audi and Volkswagen disclosed the Alternator Defect, Mr. Asuncion would not have purchased his Class Vehicle or would have paid significantly less for it.

31.    Additionally, as result of the Defect, Mr. Asuncion has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. His vehicle has also suffered diminution in value due to the Defect.

32.    On April 7, 2023, through his counsel, Mr. Asuncion served Audi and Volkswagen with a CLRA pre-suit letter notifying Audi and Volkswagen of claims on behalf of himself and other similarly situated consumers for breach of express and implied warranty and violation of consumer protection statutes, and demanding, *inter alia*, relief on behalf of himself and all putative class members.

### Plaintiff James Quann (Washington)

1.    Plaintiff James Quann is a citizen and resident of Washington.

33.    In or around October 2021, Mr. Quann purchased certified pre-owned 2019 Audi Q8 from AutoNation which is an authorized Audi dealership located in Spokane, WA.  Prior to his purchase, Mr. Quann spoke with his dealer about the

vehicle, test drove the vehicle, reviewed the window sticker, and looked at a brochure. Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Alternator Defect had been disclosed.

34.    Mr. Quann purchased his vehicle for personal, family, or household use. At all times, Mr. Quann has attempted to use his Class Vehicle in the normal and expected manner.

35.    On February 15, 2023, when vehicle had been driven about 60,000 miles, Mr. Quann received a notification on his vehicle's dashboard indicating a drive system malfunction while driving on a busy interstate. His vehicle began slowing down and entered into limp mode, forcing him to quickly pull his car to the side of the highway before it completely shut off.

36.    His car was towed to the dealership.  The technician diagnosed the issue as a result of an alternator failure. As the alternator parts were and still are on backorder, Mr. Quann has been waiting for approximately two months so far without his vehicle. In the meantime, he has incurred approximately $1,800 in rental car costs to use during the time he is without his vehicle.

37.    Had Audi and Volkswagen disclosed the Alternator Defect, Mr. Quann would not have purchased his Class Vehicle or would have paid significantly less for it.

38.    As result of the Defect, Mr. Quann has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, rental car costs, and lost time. His vehicle has also suffered diminution in value due to the Defect.

### Defendants

39.    Defendant Audi of America, LLC ("Audi") is a New Jersey Limited Liability Company headquartered in Herndon, Virginia.

40.    Defendant Volkswagen Group of America, Inc. ("Volkswagen") is incorporated in the state of New Jersey and headquartered in Herndon, Virginia.

41.    Volkswagen and Audi are engaged in the business of designing, manufacturing, warranting, marketing, advertising, and selling vehicles, including the Class Vehicles, under the "Audi" brand name through a network of thousands of dealerships in the United States.

42.    The design, manufacture, distribution, service, repair, modification, installation and decisions regarding the alternators and other components within the Class Vehicles were controlled exclusively by Defendants and their agents and affiliates.

10

## FACTUAL ALLEGATIONS

**A.    The Alternator Defect**

43.    A vehicle's alternator converts mechanical energy produced by the engine to electrical energy that in turn charges the battery and provides electric current to the vehicle's electronic systems.

44.    Electric current and electrical energy are necessary for many vehicle functions, including windshield wipers, power steering, anti-lock braking, and, in some vehicles, airbag deployment.

45.    The alternator is a critical component of a car's electrical system. It provides power to the electrical system while the engine is running.

46.    If the alternator fails to perform properly, a vehicle's electrical system will not have the requisite power to operate, and the car will slowly lose power and die.

47.    Unfortunately for consumers, the alternators in the Class Vehicles are defective. A significant number of drivers have experienced and reported total power loss in their vehicles due to alternator failure.

48.    When the Defect first manifests, it often presents as issues with one of the electrical systems of the vehicle (lights, doors, etc.). This causes an indicator light to come on. The vehicle will then slowly lose power if it is being operated,

eventually coming to a standstill, or fail to start if the defect manifests while the vehicle is off.

49.    When the alternator fails, electricity cannot get to the various systems within the vehicle that depend on electrical power, and so those systems become inoperable.

50.    Often, the alternator will fail entirely while the vehicle is being driven. This presents a significant safety hazard because it can cause the car to shut down while in motion, becoming dangerous to drivers, passengers, and others on or near the road.

51.    The Alternator Defect poses a significant safety hazard to and financial hardship on Class Vehicle owners and lessees.

52.    The Defect requires extensive repairs to fix. And while the Defect often occurs within Audi's 50,000-mile new vehicle warranty, Defendants have not been performing necessary maintenance and replacement within a reasonable time. Additionally, many owners and lessees have had to pay for the alternator replacements out-of-pocket. Alternator replacements can cost thousands of dollars.

53.    Owners and lessees further incur considerable out of pocket expense in the form of rental cars, alternative transportation, and towing/roadside assistance when their Vehicles break down. Class Vehicles requiring alternator replacements often sit at Audi Dealerships for weeks or months before the replacement is

performed. Recently, alternators have been on backorder and customers have not been given accurate information about when their vehicles will be operable again.

54.    Furthermore, there is no guarantee that the replacement alternators will not also be subject to the Alternator Defect and fail again.

55.    Audi has extended its warranty coverage for the alternator to 7 years for affected vehicles. However, this warranty extension does nothing to address the serious safety issues caused by the defect.  Moreover, Class Vehicle owners and lessees are routinely told that alternator replacements are on backorder for months. Nor does the warranty extension promise to provide reimbursement for out of pockets like rental cars or towing. There is also no indication Defendants have fixed the Defect, so even with the warranty extension, drivers will continue to experience dangerous and repeated alternator failures because the replacement alternators suffer from the Defect as well.

56.    Defendants, through their authorized dealerships and service centers, have failed to remedy the Defect.  Until the Defect is fixed by Defendants, owners and lessees of Class Vehicles will continue to be at risk of dangerous power loss, costly alternator replacements, and the expense and inconvenience of frequent dealership visits.

57.    The Defect thus continues to pose a safety hazard as well as impacts the central functionality of the Class Vehicles.

**B.    Defendant's Knowledge of the Defect**

58.    Plaintiffs' experiences are not isolated or outlier occurrences. The internet is replete with driver complaints on message boards, social media, and other websites concerning the Alternator Defect.

59.    Defendants have a duty to disclose the Defect due to, *inter alia*, its knowledge that the Defect poses a serious safety hazard, the fact that the Defect affects the central functionality of Class Vehicles, their superior and exclusive knowledge of the Defect, and the fact that the Defect constitutes information reasonable consumers would want to know.

60.    Numerous complaints about the Defect appear on websites Defendants actively monitor, such as the website for the National Highway Traffic Safety Administration ("NHTSA"), Audi owner message boards, and social media. Many complaints posted on social media websites such as Facebook and Twitter also tag Defendants' social media accounts in the posts. Although Defendants monitor these forums, it is difficult for potential consumers to do so, giving Defendants exclusive knowledge of the Defect. The following are a sampling of the complaints submitted by Class Vehicle owners and lessees which date back to at least 2018[1]:

---

[1] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

**User "Amy D" on May 27, 2018:**

- "I'm so upset. My brand new Audi Q7 fully stopped on highway w my 2 kids in back on way to her birthday party. A car almost hit us from behind. Electrical malfunction that @Audi  will not fix. Super traumatic experience with my toddlers :( @AudiOfficial."

**User "PriceLeads" on March 3, 2020:**

- "Leased a 2020 @AudiOfficial #Q7 from @AudiMendham unidentified electrical malfunction within 2 weeks! Battery replaced, issue not clear, stuck with a brand-new car with fault that could repeat.  Not a great start for a first-time #Audi owner @Audi #cars"

**User "scurvy II" on October 25, 2020:**

- "Brand new 2020 A6 Allroad with 30 miles on the clock started throwing electrical system messages on the ride home from the dealer. Unfortunately, we were closer to home so I parked it overnight and hoped the issues would go away overnight. Nope, the warning turned into a malfunction and told me to stop the car. Not sure how I'll be getting this to the dealer."

**User "NJRST" on February 9, 2021:**

- "So today I received an error "Electric System Malfunction" message on the dash. Drone fine for the 5 minutes left in my drive. I turn it off, come back in an hour and the light is still there. There was a check engine light up top and the battery light at the bottom. After about 5 minutes of driving, I get a random rear light error message. Then, I get a system malfunction message, so a red warning light is on. Starting to look like Christmas again lol. At this point I started heading to a local dealert. Whole ****ing electrical sent went. It told me to pull over slowly. I felt and heard a loud clunk as well. Of course I've pulled over by now. Called a local dealer, explained the situation, then I called Audi roadside to pick up the car. I've looked into the messages and I'm thinking it's related to the 48 volt hybrid system in these cars. I think it's worthless that they would implement this kind of technology in these cars. So unnecessary and more gimmicky."

**NHTSA Complaint 11405652 on March 30, 2021 (Incident Date March 6, 2021):**

- "WHILE OVERTAKING ANOTHER CAR ON A 2 LANE ROAD UNDER HIGH ACCELERATION (90 MPH) IT APPEARED THAT ALL ELECTRONIC SYSTEMS IN THE CAR FAILED. THE DISPLAY SHOWED SEVERAL SYSTEMS FAILING AFTER ANOTHER AND BEEPING INDICATORS WERE HEARD. THE POWER BREAKING FAILED, ONLY NON-POWER ASSISTED BREAKING, POWER STEERING FAILED AND THE ENGINE STALLED DURING THE TIME WHILE OVERTAKING ANOTHER CAR. I COULD STILL OVERTAKE THE OTHER VEHICLE AND WAS ABLE STOP THE CAR ON THE SIDE OF THE ROAD. WHEN PARKING I SHUT OFF THE IGNITION, STARTED AND WAS ABLE TO CONTINUE. THE SAME ISSUE HAPPENED LATER ON THAT DAY. THEN AFTER THAT EVENT THE SOS MALFUCTION WARNING CAME ON AS WELL AS THE ENGINE ORANGE LED (SEE PICTURE). THIS HAD NO DIRECT EFFECT ON DRIVING AND THIS WARNING STAYED ON FOR ABOUT A WEEK. SUDDENLY THAT WARNING DISAPPEARED."

**NHTSA Complaint 11431540 on September 2, 2021 (Incident Date August 28, 2021**

- "I was slowing down to stop at a traffic light when a message was displayed on the instrument panel that says "Electrical System Malfunction" with a yellow battery icon. A few seconds later the same "Electrical System Malfunction" with a red battery icon. Then the vehicle came to a complete stop and was inoperable. There was almo smoke coming from the hood near the positive battery terminal. The smoke had an electrical smell to it. I had no opportunity to pull over and was stuck in the middle of a very busy road right at the stop line of the traffic light. My family and I had to exit the vehicle with traffic on both sides of us and get to the side of the road safely. There was no prior indication that there was a problem, this happened all within about 5-10 seconds and I had no time to try and pull over to safety. I have found other complaints about this vehicle that are similar (see under the reliability section on Consumer Reports). The dealer identified the issue as an "internal failure" of the generator and 48v battery system, but had no explanation as to why it happened nor can they guarantee it will not happen again."

**NHTSA Complaint 11496196 on December 6, 2022 (Incident Date November 21, 2022):**

- "My vehicle had a complete electrical failure, when caused everything to shut down. The engine, door locks, hazards, power steering, e brake, etc. were all inoperable. On Sunday, Nov 20th, I received a yellow warning light that said, "electrical system malfunction, please contact service." I parked the car and called the dealer the following morning to ask how sever this warning was (could I drive the car or does this require a tow?). They advised me to bring the car in. While heading to the dealership, I received several other warning lights in rapid succession: electrical system malfunction, safely stop vehicle; parking aid malfunction, transmission malfunction, rear spoiler malfunction, and others. The vehicle died about 30 seconds after these warning lights appeared. I was on the highway in morning rush hour traffic at the time, but I was in the right lane and was able to coast to an off-ramp and park on the side of the road. With little to no control over the car, I could have easily been in accident. The dealer has confirmed that the cause was the start-stop generator, which caused a fault in the Mild Hybrid system and 48V battery. The car is still "bricked" and located at Audi New Orleans. It is available for inspection if needed (parts are not expected anytime soon)."

**User "Jack E." on December 28, 2022:**

- "I am writing to express my extreme dissatisfaction with the service and treatment I have received from this company. Despite being a loyal customer for 10 years, I have been continuously let down by your lack of action and accountability. I was recently in need of an alternator replacement and was promised a loaner car while the repairs were being made. However, upon arrival at the dealership, I was informed that no loaner cars were available and that there was no date for when the alternator would be in inventory. To make matters worse, I am still being charged for my lease despite the fact that my car is inoperable. I have been continuously promised that this matter would be escalated, but to no avail. The treatment I have received from this company is completely unacceptable and unconscionable. I am extremely disappointed in how this situation has been handled and demand immediate action to rectify the situation. AUDI IGNORING PROBLEM, CUSTOMER

SERVICE AWFUL, NEED HELP KEEP CALLING ALL I HEAR IS
THEY ARE ESCALATING"

**NHTSA Complaint 11502114 on January 17, 2023 (Incident Date December
29, 2023):**

- "Multiple warnings indicating to contact dealer (Lane departure, adaptive
  cruise control, collision avoidance, electrical system, start/stop, etc) then 1
  minute later transmission failure and engine failure imminent. After a minute
  or two my center MMI went blank then my electronic dash went blank,
  transmission went into neutral and the engine died all within a few seconds.
  Fortunately I was able to coast to a stop in the center median of an
  expressway and contacted the dealer. Flatbed towed to dealer who stated
  most likely the generator between the lithium battery bank and gas engine
  failed. They have seen several in this year for A6 and A7's with mild hybrid
  engines. I was lucky to be in low volume traffic as there was no power to
  indicate to drivers around me that my engine quit and not even turn signals
  worked. After having car towed to Audi dealer, they proceeded to tell me it
  was the starter/generator and the part was on back order for two to three
  months."

**NHTSA Complaint 11502819 on January 20, 2023 (Incident Date October 15,
2022):**

- "Oct 15, 2022 lights began flashing. Electrical Malfunction came up. Said to
  pull over safely as soon as possible. Dealership said it is not safe to drive. Is
  still at the Audi dealership since they could finally get it in Nov 16, 2022. It
  has 17,248 miles on it. Am told it needs a new Alternator/Generator and
  there is no expected timeframe. It is now Jan 20, 2023 and I have been
  without a car."

**NHTSA Complaint 11503455 on January 24, 2023 (Incident Date January 17,
2023):**

- "My electrical system failed and the car died on the freeway. This is now
  recognized as a chronic problem- a software bug in the 48 volt mild hybrid
  system- with several Audi models, including this A6 Allroad. The bug
  apparently damages the vehicles alternator, which must then be replaced.
  There is a several month backorder on this part, so hundreds if not thousands

Audis remain unrepaired on the lots. They are dying on roads across the USA on a daily basis."

**User Sera on January 25, 2023:**

- "Very dissatisfied w/ @Audi My boyfriend has been w/o 21 A6 for 1 month b/c the alternator malfunctioned. Waited 7 hours for a tow & never got a loner. Still paying for a car we can't use. No one is accommodating us & there no eta on when the car will be fixed. @AudiOfficial"

**NHTSA Complaint 11505385 on February 3, 2023 (Incident Date January 31, 2023):**

- "I purchased the car new around June 2020 and it currently has just under 26,000 miles on it. Earlier this week while driving the car, an electrical malfunction warning appeared on the dashboard display. The first dealership I contacted did not deem it serious and set me up for an appointment over a month away. The second dealership I called had me tow the car in right away as the thought was my alternator had failed. A call back later that afternoon confirmed the alternator did in fact fail. That dealer also indicated that the wait time for a replacement was several months away. This seems to indicate much larger problems with this part as alternators are fairly common and very necessary components."

61.    In addition to being on notice of the Alternator Defect through NHTSA and other online complaints dating back to at least 2018, Defendants also directly learned of the widespread alternator problems from their network of dealerships. Many of the customers who wrote online or to Defendants about their bad experiences with the Defect report having taken their Class Vehicles into Audi dealerships because of the Defect. Upon information and belief, Defendants began to see complaints related to the Defect through its dealers as early as 2018 when it began selling the 2018 model-year Class Vehicles.

62.    Likewise, many Class Members report contacting Defendants' customer service for information about the Defect, their need for alternator replacements, the status of backordered parts, and requests to cover rental car bills. This reinforces the fact that Defendants not only have been contacted directly about the Defect but have had significant internal discussions over how to handle particularly disgruntled customers.

63.    Audi has issued several manufacturer communications to its dealers about the Alternator Defect. On March 3, 2022, Audi issued TSB 10222114. This communication instructs dealerships on how to handle customer complaints that their vehicle will not start or is suffering from an electrical system malfunction. The suggested repair consists of installing the latest software updates, particularly those related with the electrical system, and replacing the defective alternator.

64.    Audi also released TSB 10228815 on December 22, 2022 in regard to the backorder of alternators. In it, they offer up to $30 per day in reimbursement for Audi-branded loaner cars to all owners/lessees of Audi vehicles affected by the alternator failure and awaiting parts replacement. Many owners and lessees were without their vehicles for months awaiting an alternator replacement, were not able to obtain a loaner vehicle from Audi dealerships, and paid for rental vehicles out of pocket.

65.    Notably, while these manufacture communications show Defendants have been aware of and actively studying the Defect for a while, none of them suggest warning current or prospective customers, or preemptively repairing Class Vehicles.

66.    Defendants would also have been made aware of the Defect through prerelease testing. Vehicles, particularly top of the line luxury vehicles like those at issue, undergo significant prerelease testing on all components and systems. Because the Defect relates to the electrical system, it would likely have been particularly studied since the electrical systems in modern vehicles power an ever-increasing array of features and functions.

67.    Despite their knowledge of the Alternator Defect, Defendants failed to disclose it to Plaintiff and other Class Members. Defendants could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through their network of dealers, in owners' manuals, on their website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had Defendants disclosed the Defect in any of these places, reasonable consumers would have been aware of it.

68.    Despite receiving complaints from drivers of earlier model year vehicles, Defendants continued to design, manufacture, and sell additional model years of Class Vehicles with the same alternators, and therefore the same Defect,

without informing prospective buyers about the Defect. In fact, it appears Defendants continue to put the same defective alternator into new vehicles.

69.    On information and belief, there are no significant differences between the alternators as installed in the Class Vehicles or in the way in which they are installed that would impact the Alternator Defect or functionality as between the different models and years of Class Vehicles.

70.    Despite its long-running knowledge of the Alternator Defect, Defendants still do not inform prospective buyers about the Defect. Nor have Defendants warned current owners and lessees about the Defect and the attendant hazards.

71.    As a consequence of Defendants' action and inaction, Class Vehicle owners and lessees have been deprived of the benefit of their bargain, subjected to hazardous vehicle power loss risks, suffered alternator damages and had to pay for expensive alternator replacements, incurred lost time and out-of-pocket costs from frequent dealership visits and increased maintenance costs, and had to pay for rental/loaner vehicles. Class Vehicles also have suffered a diminution in value due to the Defect.

72.    Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

## TOLLING OF STATUTES OF LIMITATIONS

73.    Because the Alternator Defect cannot be detected until it manifests, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing or leasing their Class Vehicles, despite exercising due diligence.

74.    Plaintiffs and Class Members had no realistic ability to discover that the alternator was defective until it prematurely failed and would have no reason to believe that the issues they were experiencing were caused by a widespread, systemic defect.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and Class Members.

75.    As alleged herein, Defendants have known about the Alternator Defect for years and has failed to disclose and actively concealed the existence of the Defect to consumers.  Therefore, equitable tolling of statute of limitations is also applicable to the claims asserted by Plaintiff and Class Members.

## CLASS ACTION ALLEGATIONS

76.    This action is brought and may be maintained as a class action, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rule of Civil Procedure.

77.    The Class is defined as follows:

> All persons in the United States who bought or leased, other than for resale, any of the following vehicles: 2018-2023 Audi A6, A7, A8, and Q7; 2018 and 2020-2023 Audi S6, S7, S8, and R8; 2018 and 2021-2023 Audi RS 7; 2019-2023 Audi Q8; 2020-2023 Audi A6 allroad, SQ7, SQ8, and RS Q8; 2020-2021 Audi A8 e quattro; and 2021-2023 Audi A7 e quattro.

78.    In addition, or in the alternative, State Subclasses are defined as follows:

**<u>Maryland Subclass</u>**

All persons who bought or leased, other than for resale, a Class Vehicle in the State of Maryland.

**<u>California Subclass</u>**

All persons who bought or leased, other than for resale, a Class Vehicle in the State of California.

**<u>Washington Subclass</u>**

All persons who bought or leased, other than for resale, a Class Vehicle in the State of Washington.

79.    Excluded from the Class are Audi, Volkswagen, their affiliates, and their officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserves the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

80.    **<u>Numerosity</u>**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of Defendants Audi and Volkswagen and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least thousands of Class Vehicles have been sold and leased nationwide and in the states where Plaintiffs reside. Members of the Class can be readily identified and notified based

upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Defendants in connection with its sales and leases of Class Vehicles.

81.   **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.      whether Defendants engaged in the conduct alleged herein;

b.      whether Class Vehicles are defective;

c.      whether Defendants placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

d.      whether Defendants knew or should have known of the Defect, and if so, for how long;

e.      when Defendants became aware of the Defect in the Class Vehicles;

f.      whether Defendants knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.      whether Defendants' conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.      whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.      whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.      whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Defendants' conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.      whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

82.    **<u>Typicality</u>**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by Defendants' uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Defendants relating to the conduct alleged herein, and the same conduct on the part of Defendants gives rise to all the claims for relief.

83.    **<u>Adequacy</u>**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—

26

including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

84. **<u>Superiority</u>**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

85. **<u>Injunctive Relief</u>**: Audi has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

<u>COUNT I</u>
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiff Asuncion, Individually and on Behalf of the California Subclass**

86.    Plaintiff Asuncion incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

87.    Plaintiff brings this claim individually and on behalf of the California Subclass Members who purchased or leased a vehicle for personal use.

88.    Plaintiff and the members of the California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code §1761(d).

89.    Audi and Volkswagen are "persons" as defined under the CLRA. *See* Cal. Civ. Code §1761(c).

90.    Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code §1761(a).

91.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code §1770(a).

92.    Audi and Volkswagen engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the California Subclass members that the Class Vehicles suffer from the Alternator Defect (and the costs, risks, and diminished

value of the Class Vehicles as a result of this Defect). Defendants' conduct violated at least the following enumerated CLRA provisions:

    a. Defendants represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

    b. Defendants represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

    c. Defendants advertised its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

    d. Defendants represented that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

    e. Defendants inserted an unconscionable provision into its warranty in violation of section 1770(a)(19).

93.    Defendants' unfair or deceptive acts or practices occurred repeatedly in their trade or business, were capable of deceiving a substantial portion of the purchasing public, and created a serious safety hazard for the public.

94.    Defendants knew, or should have known, or was reckless in not knowing that the Class Vehicles were defective, posed a safety hazard, would fail prematurely, and were not suitable for their intended use.

95.    Defendants were under a duty to Plaintiff and Class members to disclose the defective nature of the Class Vehicles and the Alternator Defect because:

    f. Defendants knew of but actively concealed the Defect from Plaintiff and the California Subclass;

29

      g.   Defendants were in a superior and exclusive position to know the true facts about the Defect, which poses serious safety hazards and affects the central functionality of the vehicle, and Plaintiff and the California Subclass members could not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which Defendants knew; and

      h.   Defendants made partial representations regarding the reliability, safety, and quality but suppressed facts regarding the Defect.

96.   The facts that Defendants misrepresented to and concealed from Plaintiff and the other Class members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price for them.

97.   The Defect poses a serious safety hazard and affects the central functionality because Class Vehicles suffering from the Defect become inoperable.

98.   In failing to disclose the material Defect, Defendants have knowingly and intentionally concealed material facts in breach of its duty to disclose.

99.   Plaintiff and the California Subclass have suffered injury in fact and actual damages resulting from Defendants' material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff and the California Subclass members known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

100. As a direct and proximate result of Defendants' unfair and deceptive conduct, therefore, Plaintiff and California Subclass members have been harmed.

101. Pursuant to Cal. Civ. Code § 1780, Plaintiff Asuncion seeks only injunctive relief at this time. Pursuant to Cal. Civ. Code § 1782, on April 7, 2023, Plaintiff Asuncion sent a letter to Defendants notifying them of the CLRA violations alleged herein and requesting that they cure these violations.

102. If Defendants do not cure the alleged violations within 30 days of receipt of the letter, Plaintiff will seek to amend this claim to demand damages and any other relief available under the CLRA, as well attorneys' fees and costs.

103. Plaintiff's CLRA venue declaration is attached as Exhibit 1 to this complaint in accordance with Cal. Civ. Code § 1780(d).

## COUNT II
### Violations of the California Unfair Competitions Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200–17210
### Plaintiff Asuncion, Individually and on Behalf of the California Subclass

104. Plaintiff Asuncion incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

105. Plaintiff Asuncion brings this claim individually and on behalf of the California Subclass.

106. The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue

or misleading advertising." Cal. Bus. & Prof. Code § 17200. Defendants' conduct violates each of these prohibitions.

**Unlawful Conduct**

107. Defendants' conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act and the CLRA.

**Unfair Conduct**

108. Defendants' conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles unsafe, unreliable, and inoperable and are therefore unfit for their ordinary and intended use.

109. Defendants acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

      a.    Knowingly selling Plaintiff Asuncion and California Subclass members Class Vehicles with the Defect;

      b.    Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

      c.    Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

d.    Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

e.    Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief.

110. The gravity of the harm resulting from Defendants' unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

111. There are reasonably available alternatives that would further Defendants' business interests of increasing sales and preventing false warranty claims. For example, Defendants could have: (a) acknowledged the Defect and provided a permanent, effective fix for the Defect; and/or (b) disclosed the Defect prior to prospective consumers' purchases.

112. The harm from Defendants' unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent Defect, and Defendants have failed to disclose it. Plaintiff and California Subclass members did not know of, and had no reasonable means of discovering, the Defect.

**Fraudulent Conduct**

113. Defendants' conduct is fraudulent in violation of the UCL. Defendants' fraudulent acts include knowingly and intentionally concealing from Plaintiff and

California Subclass members the existence of the Defect and falsely marketing and misrepresenting the Class Vehicles as being functional, reliable and safe.

114. Defendants' misrepresentations and omissions alleged herein caused Plaintiff and California Subclass members to purchase or lease their Class Vehicles or pay more than they would have had Defendants disclosed the Defect.

115. At all relevant times, Defendants had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because Defendants made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

116. Accordingly, Plaintiff Asuncion and California Subclass members have suffered injury in fact, including lost money or property, as a result of Defendants' unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

117. Plaintiff Asuncion seeks appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin Defendants from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiff and the California Subclass members any money Defendants acquired by their unfair

competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

**COUNT III**
**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Express Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Asuncion, Individually and on Behalf of the California Subclass**

118.  Plaintiff Asuncion incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

119.  Plaintiff Asuncion brings this claim individually and on behalf of the California Subclass who purchased or leased a Class Vehicle for Personal, Family or Household Purposes.

120.  Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

121.  The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

122.  Defendants are "manufacturers" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

123.  Defendants made express warranties to Plaintiff and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

124.  Defendants breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable

warranty period. Despite a reasonable number of attempted repairs, Defendants have failed to adequately repair the Defect.

125.  Defendants have failed to promptly replace or buy back the vehicles of Plaintiff and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

126.  As a direct and proximate result of Defendants' breach of its express warranties, Plaintiff Asuncion and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiff and the other Subclass members. Plaintiff and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

127.  Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the California Subclass members who purchased for personal, family or household purposes are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

128.  Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiff and the California Subclass members are entitled to reasonable costs and attorneys' fees.

## COUNT IV
### Violations of Song–Beverly Consumer Warranty Act
### For Breach of Implied Warranty
### Cal. Civ. Code §§ 1790–1795.8
### Plaintiff Asuncion, Individually and on Behalf of the California Subclass

129. Plaintiff Asuncion incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

130. Plaintiff Asuncion brings this claim individually and on behalf of the California Subclass who purchased for personal, family or household purposes.

131. Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

132. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

133. Defendants are "manufacturers" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

134. Defendants impliedly warranted to Plaintiff Asuncion and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

135. Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description.

37

(2) Are fit for the ordinary purposes for which such goods are used.
(3) Are adequately contained, packaged, and labeled.
(4) Conform to the promises or affirmations of fact made on the container or label.

136.  The Defect in the Class Vehicles is present in them when sold and is substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all, or substantially all, of the vehicles to experience electrical malfunction and shutdowns, and dangerous inoperability while the vehicle is in motion. The Defect thus affects the central functionality of the vehicle, poses a serious safety risk to drivers and passengers, and causes increased maintenance costs.

137.  Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Class Vehicles are unfit for their ordinary purpose due to the Defect, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

138.  Class Vehicles are not adequately labeled because the labeling fails to disclose the Alternator Defect and does not advise the California Subclass members of the Alternator Defect.

139.  Any attempt by Defendants to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple

and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Defendants' attempted implied warranty disclaimer does not conform to these requirements.

140.  The Alternator Defect deprived Plaintiff and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiff and other California Subclass members paid.

141.  As a direct and proximate result of Defendants' breach of its implied warranties, Plaintiff and the California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiff and the California Subclass members have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

142.  Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

## COUNT V
**Violations of the Maryland Consumer Protection Act ("Maryland CPA")**
**Md. Code Com. Law § 13-101,** *et seq.*
**Plaintiff Steinhardt, Individually and on Behalf of the Maryland Subclass**

143.    Plaintiff Jason Steinhardt incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

144. Plaintiff Steinhardt brings this claim on behalf of himself and the members of the Maryland Subclass.

145. Plaintiff Steinhardt and Maryland Subclass Members are consumers within the context of the Maryland CPA, *see* Md. Code Ann., Com. Law § 13-301(c)(1)(iii), who purchased and/or leased Class Vehicles for personal, family, or household use.

146. Defendants are persons within the context of the Maryland CPA. *See* Md. Code Ann., Com. Law § 13-101 (h).

147. The Maryland CPA prohibits a person from engaging in any unfair, abusive, or deceptive trade practice within the State of Maryland. *See* Md. Code Ann., Com. Law § 13-303.

148. Defendants violated Md. Code Ann., Com. Law § 13-301(2)(iv) and § 13-303 by representing that Class Vehicles are of a particular standard, quality or grade, when they are not.

149. Defendants violated Md. Code Ann., Com. Law § 13-301(2) and § 13-303 by failing to state a material fact that deceives or tends to deceive.

150. Defendants violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13-303 by advertising Class Vehicles without intent to sell or lease as advertised.

151. Defendants violated Md. Code Ann., Com. Law § 13-301(7) and § 13-303 by selling Class Vehicles knowing that a service, replacement or repair was needed.

152. Defendants violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13-303 by deception, fraud, false pretense, false promise, misrepresentation, knowing concealment, suppression and/or omission of material facts concerning Class Vehicles with the intent to deceive Plaintiff Steinhardt and Maryland Subclass Members.

153. Defendants committed unfair and deceptive acts in the course of trade and commerce within the context of the Maryland CPA as described in this Complaint in violation of Md. Code Ann., Com. Law § 13-301 and § 13-303.

154. Defendants committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation and the knowing concealment, suppression and omission of materials facts concerning the Alternator Defect in Class Vehicles and that the

vehicles are prone to alternator failure, causing electrical system malfunction, vehicle stalls, and inoperability.

155. Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Steinhardt and Maryland Subclass Members that the alternators in Class Vehicles would not fail and that the Defect could cause the vehicles to stall while in operation, increasing the risk of a serious collision.

156. Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Steinhardt and Maryland Subclass Members the characteristics of Class Vehicle alternators with respect to materials, manufacture, durability, design, longevity, maintenance and operating costs.

157. Defendants intended that Plaintiff Steinhardt and Maryland Subclass Members would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations and material omissions concerning the quality of Class Vehicle alternators with respect to materials, workmanship, design, manufacture and information in the advertising materials including brochures and the maintenance schedules of the Class Vehicles.

158. Information regarding the alternator as described in this Complaint is material to consumers in that the Defect resulted in Plaintiff Steinhardt and Maryland

Subclass Members paying for repair or replacement costs for alternator failure, as well as loaner or rental vehicles while the Class Vehicles are inoperable.

159. Defendants violated the Maryland CPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle alternators were defectively designed and/or manufactured. Defendant also violated the Maryland CPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle alternators contained defects and would require costly replacement or repair.

160. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Steinhardt and the Maryland Subclass Members.

161. Defendants knew or should have known that their conduct violated the Maryland CPA.

162. Defendants owed Plaintiff Steinhardt and the Maryland Subclass Members a duty to disclose the truth about the Defect because Defendants: (a) possessed exclusive knowledge of the Class Vehicles and the Alternator Defect; (b) intentionally concealed the foregoing from Plaintiff Steinhardt and the Maryland Subclass Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts

from Plaintiff Steinhardt and the Maryland Subclass Members that contradicted these representations.

163. Defendants also owed a duty to disclose the Defect and its corresponding safety risk because the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects.

164. Due to Defendants' specific and superior knowledge that the alternators in the Class Vehicles have the Defect, its false representations regarding that affects the qualify, safety, reliability, and performance of the Class Vehicles, and reliance by Plaintiff Steinhardt and the Maryland Subclass Members on these material representations, Defendants had a duty to disclose to Class members that the alternators in Class Vehicles are prone to failure and can cause sudden vehicle failure, rendering the Class Vehicles inoperable and that Class Members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff Steinhardt and the Maryland Subclass Members, Defendants had the duty to disclose not just the partial truth, but the entire truth.

165. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff Steinhardt and the Maryland Subclass Members. Longevity, durability, performance, and safety are material concerns to consumers. Defendants represented to Plaintiff Steinhardt and the Maryland Subclass Members that they were purchasing or leasing vehicles

that were durable, reliable, safe, efficient, and of high quality as alleged throughout this Complaint, when in fact their alternators frequently fail, necessitating premature and costly replacements, and subjecting Plaintiff Steinhardt and the Maryland Subclass Members to increased risk of collisions.

166.  Plaintiff Steinhardt and the Maryland Subclass Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Steinhardt and the Maryland Subclass Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

167.  Defendants' violations present a continuing risk to Plaintiff Steinhardt as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

168. As a direct and proximate result of Defendants' violations of the Maryland CPA, Plaintiff Steinhardt and Maryland Subclass Members have suffered injury-in-fact and/or actual damage.

169. Pursuant to Md. Code Com. Law § 13-408, Plaintiff Steinhardt and Maryland Subclass Members seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT VI
### Violations of the Washington Consumer Protection Act
### Rev. Code Wash. Ann. §§ 19.86.010, *et seq.*
### Plaintiff Quann, Individually and on Behalf of the Washington Subclass

170. Plaintiff Quann incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

171. Plaintiff brings this claim on behalf of himself and on behalf of the members of the Washington Subclass against Defendants.

172. Defendants' conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Defendants' manufacture, sale, and use of the defective alternators, which Defendants failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety, reliability, and range of the Class Vehicles.

173. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

174. Defendants' actions impact the public interest because Plaintiff was injured in the same way as tens of thousands of others purchasing and/or leasing Defendants' vehicles as a result of Defendants' generalized course of deception. All wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.

175. Plaintiff and the Washington Subclass members were injured as a result of Defendants' conduct. Plaintiff and the Washington Subclass overpaid for the

46

Class Vehicles and did not receive the benefit of their bargain, and thus the Class Vehicles have suffered a diminution in value.

176.  Defendants' conduct proximately caused the injuries to Plaintiff and the Washington Subclass members.

177.  Defendants are liable to Plaintiff and the Washington Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

178.  Pursuant to Wash. Rev. Code. Ann. § 19.86.095, Plaintiff will serve the Washington Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

179.  As a direct and proximate result of Defendants' breach of the implied warranties of merchantability, Plaintiff and the Washington Subclass members have suffered damages in an amount to be proven at trial.

**<u>COUNT VII</u>**
**Breach of Express Warranty**
**Plaintiffs, Individually and on Behalf of the Class and Their Respective State Subclasses**

180.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herewith.

181.  Plaintiffs bring this claim on behalf of the Class and, additionally or in the alternative, the state Subclasses.

182.  Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

183.  The Class Vehicles are "goods" as defined under the UCC.

184.  Defendants provided a New Vehicle Limited Warranty that expressly warranted Defendants would repair any defects in materials or workmanship free of charge during the applicable warranty periods. Defendants offer similar warranties on certified used Audis and extended warranties for both new and used vehicles.

185.  Defendants breached their express warranty by failing to provide an adequate repair when Plaintiffs and the Class Members brought their Class Vehicles to authorized Audi dealerships following manifestation of the Alternator Defect.

186.  The warranty formed the basis of the bargain reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

187.  Many Class Members experienced the Alternator Defect during the warranty period. Despite the existence of the express warranty, Defendants failed to inform Plaintiffs and Class Members that the Class Vehicles were defective and failed to fix the Alternator Defect.

188.  The limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable timeframe.

189.  As a result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, diminished vehicle value, substantial loss in resale value of the vehicles, and other related damages.

190.  Defendants were provided notice of the issues complained of herein by complaints filed against them, dealership visits, contact directly to Defendants, several pre-suit notification letters and the instant lawsuit, within a reasonable amount of time.

191. Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT VIII
### Breach of Implied Warrant of Merchantability
### Plaintiffs, Individually and on Behalf of the Class and Their Respective State Subclasses

192. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

193.  Plaintiffs bring this claim on behalf of the Class and, additionally or in the alternative, the state Subclasses.

194.  Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

195.  The Class Vehicles are "goods" as defined under the UCC.

196.  A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

197.  The Class Vehicles, when sold and leased, and at all times thereafter, were not of merchantable quality or condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that the alternators—a central and critical component of the Class Vehicles—are prone to malfunction and failure due to a common defect. The Alternator Defect renders the Class Vehicles unmerchantable, as they are unreliable, unsafe, partially or fully inoperable, and not substantially free from defects.

198.  Defendants were provided notice of the issues complained of herein by complaints filed against them, dealership visits, contact directly to Defendants, several pre-suit notification letters and the instant lawsuit, within a reasonable amount of time.

199.  Plaintiffs and Class Members have had sufficient direct dealings with either Defendants or their agents (e.g., dealerships and customer service) to establish privity of contract between Defendants on one hand and Plaintiffs and each of the Class Members on the other. Nonetheless, privity is not required here because

Plaintiffs and each of the Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, specifically of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided alongside the Class Vehicles; the warranty agreements were designed for and intended to benefit the end-consumers only.

200.  As a direct and proximate result of the breach of the implied warranties, Plaintiffs and Class Members were injured and are entitled to damages.

<u>**COUNT IX**</u>
**Unjust Enrichment**
**Plaintiffs, Individually and on Behalf of the Class and Their Respective State Subclasses**

201. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

202. Plaintiffs bring this claim on behalf of the Class and, additionally or in the alternative, the state Subclasses.

203. This claim is pleaded in the alternative to the other claims set forth herein.

204. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of Class Vehicles manufactured with defective alternators.

205. Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct alleged herein, Plaintiffs and the Class Members were not receiving Class Vehicles of the quality, nature, fitness or value that had been represented by Defendants, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class Members expected that when they purchased or leased their Class Vehicles, the Class Vehicles would not be manufactured with defective alternators.

206. Defendants have been unjustly enriched by their fraudulent, deceptive, unlawful, and unfair conduct, and by their withholding of benefits and unearned monies from Plaintiffs and the Class Members at the expense of these individuals.

207. Equity and good conscience advise against permitting Defendants to retain these woe begotten profits and benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, hereby request that this Court enter an Order against Defendants providing for the following:

A.    Certification of the proposed Class and/or Subclasses, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B.    An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

52

C.     Injunctive relief in the form of a recall;

D.     Equitable relief, including in the form of buyback of the Class Vehicles;

E.     Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.     An Order requiring Defendants to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G.     An award of reasonable attorneys' fees and costs as permitted by law; and

H.     Such other or further relief as may be appropriate.

## **JURY DEMAND**

Plaintiffs hereby demands a trial by jury for all claims so triable.

Dated:  May 5, 2023                               */s/ Timothy N. Mathews*
                                                 CHIMICLES SCHWARTZ KRINER
                                                 & DONALDSON SMITH LLP
                                                 Timothy N. Mathews (NJ I.D. No. 022262003)
                                                 Alex M. Kashurba (NJ I.D. No.1407122014)
                                                 361 W. Lancaster Avenue
                                                 Haverford, Pennsylvania 19041
                                                 tnm@chimicles.com
                                                 amk@chimicles.com

                                                 J. LLEWELLYN MATHEWS
                                                 N.J. Attorney I.D. No. 4591973
                                                 13 Garden Street
                                                 Mount Holly, NJ 08060
                                                 Tel: (609) 519-7744
                                                 jlmathews@jlmesq.com

*Attorneys for Plaintiffs and the Proposed Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2023 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notice of same to all counsel of record.

<u>    */s/ Timothy N. Mathews*   </u>
Timothy N. Mathews
